### CLINGMAN v. MILLER et al.

#### (Circuit Court of Appeals, Eighth Circuit.  March 6, 1908.)

#### No. 2,647.

1. BANKRUPTCY—TRANSFER OF PROPERTY BY BANKRUPT—CREDITOR.

   A car load of eggs was shipped to a dealer a short time before his bankruptcy to be delivered on payment of a draft attached to the bill of lading.  In some way the bankrupt obtained delivery of the eggs without the bill of lading or payment of the draft and converted the same to his own use.  The shipper thereupon demanded payment and received certain other property in settlement.  *Held* that, whether he be considered as making the demand as damages for the conversion or as waiving the conversion and affirming the sale, he was in either case a creditor at the time the property was transferred to him in payment of his claim, whose debt was provable in bankruptcy.

2. SAME—ACTION BY TRUSTEE TO RECOVER PROPERTY TRANSFERRED—QUESTIONS FOR JURY.

   A bankrupt a short time before proceedings in bankruptcy were instituted against him, being insolvent, executed a general assignment for the benefit of his creditors under the law of Kansas.  On the same day, at practically the same time and while the assignment papers were being prepared, he transferred certain property to one of his creditors.  Gen. St. Kan. 1899, § 342, provided that "every voluntary assignment * * * made by a debtor to any person in trust for his creditors shall be for the benefit of all the creditors of the assignor," and under such statute as construed by the Supreme Court of the state an insolvent debtor engaged in making a general assignment cannot at the same time, although by a separate instrument, make a valid preference in favor of one creditor.  Bankr. Act July 1, 1898, c. 541, § 67e, 30 Stat. 564 (U. S. Comp. St. 1901, p. 3449), provides that all transfers of property made by an insolvent debtor within four months prior to his bankruptcy which are null and void as against his creditors by the laws of the state shall be null and void under the act, and the property may be reclaimed by his trustee.  *Held,* in an action by the bankrupt's trustee against the creditor to recover the value of the property so transferred, that the evidence required the submission to the jury of the question whether the transfer was substantially a part of the same transaction as the assignment so as to render it void under such statutes.

In Error to the District Court of the United States for the District of Kansas.

Plaintiff in error as trustee in bankruptcy of the estate of W. H. Pendleton, a bankrupt, brought this suit at law in the court below against Miller & Co., for the purpose of recovering the sum of $1,860 the alleged value of 400 cases of eggs which the petition alleged had been transferred by Pendleton to Miller & Co., under such circumstances as to render such transfer voidable under section 60b of the bankruptcy law, or under such circumstances as to render such transfer null and void under section 67e of said law (Act July 1, 1898, c. 541, 30 Stat. 562, 564 [U. S. Comp. St. 1901, pp. 3445, 3449]).  The case came on for trial before the court sitting with a jury, and at the close of the plain-

tiff's evidence a demurrer was interposed thereto and sustained by the court, whereupon a verdict was directed by the court in favor of the defendants. An exception was taken to the ruling of the court on the demurrer to the evidence and the only question for review is, did the court err in making said ruling?

The uncontradicted evidence introduced on the part of the plaintiff at the trial showed the following facts: W. H. Pendleton was adjudged a bankrupt by the United States District Court for the District of Kansas, June 6, 1904, and July 15, 1904, plaintiff in error was appointed trustee of his estate. Pendleton was insolvent on April 23, 1904, and continued so to be until the date of his adjudication in bankruptcy. On May 4, 1904, Pendleton made, executed and delivered to H. S. Clark of Lawrence, Kan., a deed of general assignment for the benefit of his creditors which was duly accepted by Clark and filed for record as required by law on the same day at 9:30 a. m. In regard to this assignment Pendleton testified: "Q. Now at the time you made this exchange of bills of lading for the two cars of eggs, state whether or not you had executed this deed of assignment to Mr. Clark? A. I do not think it had been executed. It was very near the time, possibly within an hour either way. Q. You may state what, if anything, had been done preparatory to making a deed of assignment before you delivered the bill of lading to Mr. Miller? A. I think probably I had been working on it some; I had been trying to get money. Q. I am asking about the execution of this deed of assignment. What had been done about that, if anything? A. I don't remember just what had been done, but I must have been working on it; the list must have been worked on. Q. How many creditors were there at that time, during those days, pressing for payment of their debts? A. I understood there were six or eight. Q. I will ask you if it is not a fact that drafts drawn upon you by your various creditors were being presented during this time and going to protest in the banks in Lawrence? A. Yes, sir. Q. Was there anything said by you to Mr. Miller in regard to your financial condition? A. I told Mr. Miller I was short of funds; yes, sir. Q. At that time? (May 4, 1904.) A. Yes, sir. Q. What efforts did you make, if any, to keep out of Mr. Miller's way? A. I was being pressed at that time for money, and I was making an effort to get it, and was not at my office very much."

April 23, 1904, Miller & Co., shipped to the order of Pendleton to be delivered to him at Chicago, one car of eggs, upon payment of a draft for the amount due on the car, said draft being attached to the bill of lading. Except for the incident of the draft being attached to the bill of lading, the sale of the eggs was intended to be a cash transaction by Miller & Co. On April 27 or 28, 1904, the car load of eggs above mentioned reached Chicago. Pendleton sold this car of eggs to J. Dixon Avery & Co. of Chicago, and in some way obtained the same from the railroad company without payment of the draft drawn by Miller & Co. The draft was subsequently protested for nonpayment and returned to Miller & Co., at Hanover, Kan., together with the bill of lading. Pendleton lived at Lawrence, Kan. The proceeds of the car of eggs amounting to $1,930 or $1,940 was received by Pendleton and went into his general estate. On May 4, 1904, Mr. Miller of the firm of Miller & Co., was at Lawrence, Kan., for the purpose of getting payment for the car of eggs shipped Pendleton. Pendleton had on May 2, 1904, shipped a car of eggs to Chicago for which he had still the bill of lading and as he could not pay Miller & Co., the money for the car of eggs sold him by Miller & Co., Miller & Co. and Pendleton agreed to exchange bills of lading, Pendleton taking the bill of lading with the protested draft attached, and Miller taking the bill of lading for the car shipped May 2d. The car of eggs for which Miller on May 4th received the bill of lading was worth $1,860. There was no evidence sufficient to sustain a finding by the jury that Miller & Co. knew that Pendleton was insolvent on May 4, 1904, or that Miller & Co. had reasonable cause to believe that Pendleton intended to prefer them as creditors, or that Pendleton was about to make a deed of assignment for the benefit of creditors. It is to recover the value of the car load of eggs that this suit was brought. There was proof of demand upon Miller & Co. by the trustee, and that the assets in the hands of the trustee would not pay the debts of the estate.

Clifford Histed (W. S. McClintock and Harkless, Crysler & Histed, on the brief), for plaintiff in error.

George J. Barker and John Q. A. Norton, for defendants in error.

Before HOOK and ADAMS, Circuit Judges, and CARLAND, District Judge.

CARLAND, District Judge (after stating the facts as above). The claim that Miller & Co. were not creditors of Pendleton at the time of the transfer of the car of eggs on May 4, 1904, arises out of an erroneous view as to the character of the claim which Miller & Co. then had against Pendleton. No doubt Miller & Co. intended the sale of the car of eggs sold on April 23, 1904, to be for cash. The sale of the eggs, however, was defeated by the unlawful conversion of the car of eggs by Pendleton without payment of the draft attached to the bill of lading, as the payment of the draft was a condition precedent to the passing of the title from Miller & Co. to Pendleton. The claim, therefore, that Miller & Co. were pressing for payment on May 4, 1904, was a claim which though amounting to the same sum in amount was not for the purchase price of the eggs, but for damages for the unlawful conversion of property. Miller & Co. having elected to receive payment for these damages instead of endeavoring to recover the eggs themselves cannot be heard to say that they were not creditors of Pendleton on May 4, 1904, and the owners of a claim against Pendleton provable in bankruptcy, which had existed since the date of the conversion of the eggs by Pendleton. If we take the position that Miller & Co. had the right to waive the tort and treat the sale as valid, we are in no better position, for that would ratify the delivery of the eggs without payment, and constitute Miller & Co. creditors beyond question.

Treating Miller & Co. as creditors, therefore, we find no evidence in the record sufficient to sustain a finding by the jury that Miller & Co. on May 4, 1904, had reasonable cause to believe that a preference was intended by the transfer to them of the car of eggs by Pendleton. This destroys any cause of action based upon section 60b of the bankruptcy law (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]). There is also no evidence in the record which would, independent of the laws of Kansas, sustain a finding of the jury that the transfer of the car of eggs by Pendleton to Miller & Co. was made with the intent on the part of Pendleton to hinder, delay, or defraud his creditors under the first clause of section 67e of said law (30 Stat. 564 [U. S. Comp. St. 1901, p. 3449]). Coder v. Arts, 152 Fed. 943, 82 C. C. A. 91; Kingsbury v. Bank, 71 Kan. 570, 81 Pac. 187.

We now come to the serious question in the case. Is there evidence in the record which would have supported a finding by the jury that the transfer of the car of eggs by Pendleton to Miller & Co. on May 4, 1904, was made by Pendleton simultaneously with and as a part of the transaction which resulted in the making of the deed of general assignment for the benefit of the creditors of Pendleton, and with the intent on his part to evade the provision of the statute of Kansas

which prohibits any preferences in deeds of general assignments? If this question be answered in the affirmative, then we think the judgment below must be reversed. The law from which this cause of action arises is as follows: The last clause of section 67c of the bankruptcy law provides that all conveyances, transfers, or incumbrances of his property made by a debtor at any time within four months prior to the filing of the petition against him and while insolvent, which are held null and void as against the creditors of such debtor by the laws of the state, territory, or district in which such property is situated shall be deemed null and void under said law against the creditors of such debtor, if he shall be adjudged a bankrupt, and such property shall pass to the trustee and be by him reclaimed and recovered for the benefit of the creditors of the bankrupt.

Section 342, Gen. St. Kan. 1899 (section 346, Gen. St. 1905), provides as follows:

"Every voluntary assignment of lands, tenements, goods, chattels, effects and credits made by a debtor to any person in trust for his creditors shall be for the benefit of all the creditors of the assignor, in proportion to their respective claims; and every such assignment shall be proved or acknowledged and certified and recorded in the same manner as is prescribed by law in cases wherein real estate is conveyed."

In Hardware Co. v. Implement Co., 47 Kan. 423, 28 Pac. 171, it was held under the above section that a debtor in failing circumstances engaged in making a general assignment of his property for the benefit of all his creditors cannot at the same time make valid preferences of certain of his creditors by chattel mortgage or otherwise. In this case a chattel mortgage given by T. C. Ritter & Co., an insolvent firm, on the same day that the firm made a general assignment for the benefit of creditors, was held null and void. In this case also the Supreme Court of Kansas quotes and approves the following language from Shillito v. McConnell, decided by the Supreme Court of Indiana, 130 Ind. 41, 26 N. E. 832:

"While it cannot be said that the debtor has in fact surrendered dominion over his property until the assignment is complete, as from the purely voluntary nature of the transaction he may at any time before the final act change his mind and refuse to complete it, yet, being completed, we think it ought to be held to relate back to the time when it was actually commenced, and cover all intervening transactions. The act of making the assignment embraces the preparation and execution of the necessary instruments; and whether that takes a long or a short time, it certainly must all be treated as one continuous act. To say that the debtor's surrender for his absolute control over the disposition of his property is to be dated from the time he actually commences to make the assignment, is to give to the entire transaction the character of good faith, and make it in fact what it purports to be, an effort to secure to all his creditors that equal consideration contemplated by the statute. But to hold that while he is thus engaged he may at the same time successfully prefer favorite creditors is to hold that he may at one and the same time do two exactly contradictory acts. It is to hold that he may be engaged in making a voluntary assignment for the benefit of all his creditors, insuring the equal distribution of all his property among all of them, without preference, and also in securing to some of these creditors payment in full of their claims to the exclusion of others; something as difficult of accomplishment as the equestrian feat of riding two horses in opposite directions at the same time."

In Watkins National Bank v. Sands et al., 47 Kan. 591, 28 Pac. 618, the Supreme Court of Kansas, in construing the above section, said:

"An examination of the testimony leads us to the conclusion necessarily reached by the District Court that Sands acted throughout in good faith and without fraudulent purpose. The debts which the mortgages were given to secure appear to be actual and bona fide, and the debtor's purpose seems to have been to devote all his property to the payment of his debts. If the assignment and mortgages were made in good faith and without actual intent to defraud or defeat creditors, the fact that they were informal or irregular is not alone sufficient to sustain an attachment. While the debts are to be treated as bona fide and the conveyances as having been made in good faith, it does not follow that the mortgages are to be upheld, nor that the mortgagees are to be treated as preferred creditors. It is true and has frequently been held that a debtor in failing circumstances may prefer creditors so long as he retains the control and disposition of his property by the payment of money or property or by securing such creditors providing the payment is made, or the security given in good faith. Such honest preference may be given at any time prior to the making of an assignment. If however, the mortgages are prepared and executed in connection with the deed of assignment and substantially at the same time, then all should be treated as a single and continuous transaction, and nothing could be taken under the mortgages."

In Jones v. Kellogg, 51 Kan. 263, 277, 33 Pac. 997, 37 Am. St. Rep. 278, the same court said:

"While there is nothing to show that any real or actual fraud intervened, yet it is the opinion of this court, from the findings and the evidence, that the mortgages and the deed of assignment were executed at substantially the same time, and as parts of substantially the same transaction. They were all drawn up the same day, to wit, November 28, 1886, were all dated the same day, to wit, November 29, 1886, and were all executed in pursuance of a single determination formed by Townley to execute them; and this determination was not entertained by him until the day on which they were drawn up to be executed; and therefore, under the following decisions, both the mortgages and the attachment must be held to be absolutely and entirely void."

In Goodman v. Kendall, 56 Kan. 440, 43 Pac. 687, it was held that, where an insolvent debtor executes to two of his creditors chattel mortgages substantially at the same time that he executes a general assignment for the benefit of his creditors so that the execution of all constitutes a single transaction, no preference can be rightly claimed under the mortgages. The validity of the transfer of the car of eggs from Pendleton to Miller & Co. under the circumstances detailed in the record must both by the provision of section 67e and general law be determined by the laws of Kansas. We may, however, look to decisions of other courts upon similar statutes for instruction. The statute of Iowa as set out in South Branch Lumber Co. v. Ott, 142 U. S. 626, 12 Sup. Ct. 318, 35 L. Ed. 1136, is as follows:

"No general assignment by an insolvent, or in contemplation of insolvency, for the benefit of creditors, shall be valid unless it be made for the benefit of all his creditors in proportion to the amount of their respective claims."

The Supreme Court of the United States in this case after reviewing the Iowa decisions held that the following propositions had been established by said decisions, relative to said law:

"Second, several instruments executed by a debtor, at about the same time, may be considered as part of one transaction, and in law forming but one in-

strument; and if, as thus construed, they have the effect of a general assignment with preferences, they are within the denunciation of the statute. Burrows v. Lehndorff, 8 Iowa, 96; Cole v. Dealham, 13 Iowa, 551; Van Patten v. Burr, 52 Iowa, 518, 3 N. W. 524. And, third, that although several instruments may be executed by the debtor at about the same time, they do not necessarily create one transaction or are to be considered as one instrument; and whether they do or not, and whether they come within the denunciation of the statute, depend upon the character of the instruments, the circumstances of the case, and the intent of the parties. Lampson v. Arnold, 19 Iowa, 479; Van Patten v. Burr, 55 Iowa, 224, 7 N. W. 522; Perry v. Vezina, 63 Iowa, 25, 18 N. W. 657; Gage v. Parry, 69 Iowa, 605, 29 N. W. 822; Garrett v. Plow Company, 70 Iowa, 697, 29 N. W. 395, 59 Am. Rep. 461; Bolles v. Creighton, 73 Iowa, 199, 34 N. W. 815; Loomis v. Stewart, 75 Iowa, 387, 39 N. W. 660."

In applying the law of Iowa as thus found to be to certain facts, the court in the same case said:

"With respect to the three other matters, there is more of a question. It appears that on the 12th of April, on receipt of a statement of account, Francis Beidler, the representative of the appellant, came to Davenport to investigate the situation. The outcome of that investigation was not satisfactory. A demand was made for a reduction of the indebtedness. The plain import of the interview was that things could not continue as they had been. Two or three days before the assignment the bank with which Ott had been doing business for a series of years, and which had been discounting his drafts before acceptance, and which was at such time carrying about $11,000 of such drafts, intimated that it must have acceptances before discounting. His son, who was his principal salesman, his only traveling man, returned from one of his trips. While ordinarily selling from $18,000 to $20,000, his sales on that trip had practically amounted to nothing. Strikes in the Southwest were significant of labor troubles, and shadowed the business outlook. With these accumulating facts, evidently Ott began to think that the end of his business career, at least so far as his present undertakings were concerned, was at hand. On the day before the assignment he gave to one Mueller, to whom he owed about $9,000, drafts on his customers for goods sold to the amount of $1,239.46. On the same day he gave to McClelland & Co., to apply on a debt of $900, a like draft to the amount of $660.80; and on the very morning of the assignment he sent a letter to George F. White, the agent of the railroad company, notifying him that he might hold four car loads of glass, then in the possession and on the tracks of the railroad company, as security for a balance of between eight and nine hundred dollars of freight due. Now, these transactions were but shortly prior to the assignment. They were in a general sense contemporaneous with it. They took place when Ott was conscious of the impending danger of the closing out of his business, and they operated as preferences to these creditors. They were so nearly related in time to the assignment, and made under such circumstances, that if in an action at law and under proper instructions the question had been submitted to a jury whether they were made with a view to an assignment, and to evade the statute, and the verdict had been in the affirmative, it would be difficult to say that such verdict was not warranted by the testimony."

In the present case the evidence showed that Pendleton was insolvent on May 4, 1904, and that he must have known it. He made the transfer to Miller & Co. substantially at the same time he made the deed of assignment. Knowing that he was insolvent, he knew that the transfer to Miller & Co. created a preference. He is charged with a knowledge of the law, and hence knew that he could not prefer any creditor in his deed of assignment. He was being pressed by his creditors. Drafts upon him were being protested at the bank. He was short of funds, and could not raise money. He told Miller & Co. so. He must be presumed to have intended the reasonably to be expected

results of his acts. The law of Kansas does not prohibit preferences, but it does say that if a debtor makes a deed of general assignment for the benefit of his creditors he must treat all alike, and that he cannot evade this prohibition of the statute by making simultaneously with the deed of assignment a separate transfer which creates a preference. The preference would be void if contained in the deed of assignment, and it is no less so because made outside of it, but at the same time and as a part of the same transaction. The intent of Pendleton is the true and guiding principle. As was said in Lumber Co. v. Ott, supra, at page 630 of 142 U. S., page 321 of 12 Sup. Ct. (35 L. Ed. 1136):

"With what intent did Ott in this case execute the various instruments prior to the general assignment? Was he intending a general assignment, and seeking to evade the statute, and to give preferences by other instruments? Or was he, finding himself involved and likely to be closed out by some of his creditors, simply preferring some, uncertain as to what disposition he should make of the balance of his property after they had been secured?"

The knowledge, or want of knowledge, of the purpose and intent of Pendleton at the time of the transfer by Miller & Co. is immaterial under the laws of Kansas; otherwise, the prohibition of the statute would be rendered useless.

In Bank v. Sands, supra, the fact that certain creditors lived in towns distant from the debtor and had no knowledge of the execution of certain mortgages seems to have been advanced as an additional reason for holding the mortgages void. We think the facts appearing in the record entitled the trustee to go to the jury, and had the jury found in his favor under proper instructions, we also think such finding would have been sustained by the evidence.

For the error in directing a verdict against the plaintiff, the judgment is reversed, and a new trial ordered. ·